IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CR-158

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| TONIA BEST MILNER, and KEISHA ANN THOMPSON, | ) ) | |
| | ) | |
| Defendants. | ) | |

On September 10, 2007, pursuant to a plea agreement, Tonia Best Milner ("Milner") pleaded guilty to two counts of bank fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1344 and 2, respectively. On that same date, Keisha Ann Thompson ("Thompson") also pleaded guilty, pursuant to a plea agreement, to the same two charges. On January 11, 2008, the court gave notice pursuant to Federal Rule of Criminal Procedure 32(h) that it was contemplating an upward variance sentence with respect to each defendant. See United States v. Milner, No. 5:07-CR-158-D (E.D.N.C. Jan. 11, 2008). On January 15, 2008, Thompson filed a sentencing memorandum opposing an upward variance. On January 16, 2008, Milner filed a sentencing memorandum opposing an upward variance. Also, on January 16, 2008, the United States ("government") filed a motion for downward departure for substantial assistance on Thompson's behalf.

On January 16, 2008, the court held sentencing hearings for each defendant. The court considered each defendant's Presentence Investigation Report ("PSR"), all evidence presented at the hearings, and all arguments and submissions of counsel. As discussed in each defendant's respective PSR and at the sentencing hearings, Milner and Thompson participated in a scheme to defraud that lasted more than eight years. During the scheme, Milner and Thompson stole more than $600,000 from the bank where Milner worked. The statutory maximum sentence for each

count of conviction is 360 months. The court enters this order to explain Milner's 72-month sentence (including a nine-month upward variance) and Thompson's 48-month sentence (including a seven-month upward variance).

I.

After reviewing each defendant's PSR, the evidence presented at the sentencing hearings, and the arguments and submissions of counsel, the court adopted the undisputed portions of each defendant's PSR. See Fed. R. Crim. P. 32(i)(3). The court made additional findings of fact at the defendants' sentencing hearings, which are hereby incorporated by reference. The court recounts some of its findings in this order.

Milner and Thompson grew up in Wilson, North Carolina and had known each other for many years. In 1998, they shared an apartment together in Wilson. At that time, Thompson (then age 21) was a former employee of the Branch Banking & Trust Corporation (BB&T) in Wilson, and complained to Milner about her financial difficulties. Milner, then age 25 and a current BB&T employee at the Wilson branch, suggested a way that the two women could steal unclaimed funds from BB&T using Milner's position in the claims adjustment department.

BB&T's adjustment department handled unclaimed funds belonging to other banks. As a part of the innumerable daily transactions between banks, small "bundles" of checks were sometimes left unclaimed. See Milner PSR ¶ 7. BB&T placed the funds represented by these "bundles" of checks into a holding account, where they stayed until a claimant came forward. At times, these bundles would sit for months without a claimant coming forward. Milner's job included keeping the general ledger with respect to these unclaimed bundles. See id.

Under BB&T's procedures, the claimant bank would claim the funds by sending a cash letter to BB&T's claims adjustment department requesting that BB&T transfer the unclaimed funds to the

2

claimant bank. The letter could be written on bank letterhead, but also could be written on plain paper without any indicia of authenticity. Milner and Thompson took advantage of BB&T's (misplaced) reliance on Milner's honesty to steal unclaimed funds from BB&T. See id.

In early 1998, Milner told Thompson to fax to Milner's attention a letter from a fictitious person named "Patricia Long," requesting that Milner release $500 in unclaimed funds to an account which purportedly belonged to a claimant bank, but which in fact belonged to Thompson. Thompson did so, and on April 1, 1998, Milner scanned BB&T's accounting books to piece together a set of unclaimed fund bundles that added up to $500. See id. ¶ 8. Once Milner identified unclaimed bundles equaling the $500 amount, she transferred the funds to Thompson's personal bank account. Thompson then withdrew Milner's share of the stolen money and gave it to Milner. This $500 theft was the inception of a scheme that would ultimately span approximately 8½ years, involve nearly 140 separate transactions, and result in the theft of nearly $625,000.

After this first transaction, Milner and Thompson altered the scheme to make it harder to detect. Rather than having Thompson send a demand for an arbitrary amount of funds, Milner would scan the BB&T books in advance for an appropriate target bundle of funds — one which was neither so large nor so stale as to attract attention when claimed. Having identified the target bundle, Milner would inform Thompson of the amount that the fictitious claimant was to request. Thompson would then fax the letter to Milner's attention. Usually the letter was from "Patricia Long," which the women recognized as a code to indicate their fraud. After illegally transferring the funds to Thompson's account, Milner would conceal the fraud under multiple layers of internal transactions. Thompson would then withdraw Milner's share of the ill-gotten gains from her account and provide it to Milner. Thompson also would sometimes cover up the scheme by further transferring the funds into multiple bank accounts, including those of Thompson's minor daughter

3

and Milner's husband. Between April 1, 1998, and January 14, 1999, the women stole $68,087.58 from BB&T. See id. ¶¶ 8–9.

By February 1999, Milner had decided to leave her job at BB&T to move to Chicago. Milner and Thompson agreed to make their final theft their largest to date. Accordingly, on February 18, 1999, Milner and Thompson stole $15,000 from BB&T. See id. ¶ 8. This was the largest single amount stolen in one transaction during the scheme. See id. After stealing the $15,000, Milner quit her job at the bank and moved to Chicago. The fraud scheme thus temporarily stopped, with a total loss to BB&T of $83,087.58. See id.

In early 2000, Milner left Chicago, moved back to Wilson, and obtained her former job at BB&T. After eleven months to consider their crimes, Milner and Thompson were undeterred and unrepentant, and promptly renewed the scheme. Between January 21, 2000, and October 4, 2006, through 107 separate fraudulent transactions, the two women stole an additional $539,960.11 from BB&T. See id. By March 2002, Thompson had moved to Virginia Beach, Virginia and had begun working at a branch of HSBC Bank USA, N.A. ("HSBC"). Nonetheless, Thompson continued in the scheme. See Thompson PSR ¶ 26.

BB&T finally detected the scheme in August 2006 when BB&T officials became suspicious that bundles of funds which had been sitting in the holding account for very long periods of time began to be claimed. When BB&T officials finally discovered the fraud, they confronted Milner. Milner confessed to taking money from BB&T, but did not disclose the amount stolen or the full extent of the fraud. See Milner PSR ¶ 10. BB&T reported the fraud to the FBI. The FBI began an investigation, as did BB&T. The FBI and BB&T quickly determined the scope of the fraudulent scheme and the loss to BB&T.

Throughout the scheme, Milner kept approximately two-thirds of the stolen funds, and

4

Thompson received one-third. Milner claimed the larger share because she told Thompson that she was "taking a bigger risk" than Thompson, and that there was a third person involved in the scheme. Milner described this third person to Thompson as a Caucasian woman who worked in Milner's office, but Milner would not reveal this person's name to Thompson. Proving the adage that there is no honor among thieves, there was no such third person. As a result of Milner's lie to Thompson, Milner ultimately received approximately 66% of the $623,047.69 in stolen funds, while Thompson received approximately 34%.

Government investigators interviewed Thompson in April 2007. Thompson initially stated that the scheme had operated for approximately "a couple years." However, Thompson confessed to the full breadth of the fraud after the FBI confronted her with the full extent of the evidence. Although in April 2007 the government already knew to a reasonable certainty that only Milner and Thompson were involved, it requested that Thompson place a monitored phone call to Milner regarding the identity of the alleged third person. Thompson made the call, and Milner reported that the third person no longer worked at BB&T and could not be contacted. See Thompson PSR ¶ 12.

II.

The Supreme Court has described the process for imposing a sentence under the now-advisory sentencing guidelines as follows:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the

justification is sufficiently compelling to support the degree of the variance.... [A] major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

Gall v. United States, 128 S. Ct. 586, 596–97 (2007) (citations and footnote omitted); see also Kimbrough v. United States, 128 S. Ct. 558, 569–70 (2007) ("[W]hile the statute still requires a court to give respectful consideration to the Guidelines, [United States v.] Booker permits the court to tailor the sentence in light of other statutory concerns as well." (citations and quotation omitted)); Rita v. United States, 127 S. Ct. 2456, 2469 (2007) ("The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [United States Sentencing] Commission or the appeals court."); Cunningham v. California, 127 S. Ct. 856, 867 (2007); United States v. Pauley, No. 07-4270, 2007 WL 4555520, at *4 (4th Cir. Dec. 28, 2007). The court recognizes its duty within this framework to "make an individualized assessment based on the facts presented," Gall, 128 S. Ct. at 597, and to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); see Kimbrough, 128 S. Ct. at 570; accord United States v. Tucker, 473 F.3d 556, 560–61 (4th Cir. 2007); United States v. Davenport, 445 F.3d 366, 370 (4th Cir. 2006).

### III.

Under the procedure described in Gall, the court must first calculate the advisory guideline range with respect to each defendant. See Gall, 128 S. Ct. at 596–97.

### A.

The court turns first to the advisory guideline range for defendant Milner, as discussed in her PSR. The bank fraud count and the aiding and abetting count are grouped. See U.S. Sentencing Guidelines Manual § 3D1.2(d) (2007) [hereinafter "U.S.S.G."]; Milner PSR, Part D. The base

6

offense level for violating 18 U.S.C. § 1344 is 7. See U.S.S.G. § 2B1.1; Milner PSR ¶ 32. Because the loss exceeded $400,000 but was less than $1,000,000, the court adds 14 levels. See U.S.S.G. § 2B1.1(b)(1)(H); Milner PSR ¶ 33. The court adds two more levels because the offense involved "sophisticated means." See U.S.S.G. § 2B1.1(b)(9)(C); Milner PSR ¶ 34. The court also increases the offense level by two because Milner was a leader or organizer of the criminal activity. See U.S.S.G. § 3B1.1(c); Milner PSR ¶ 36. The court also increases the offense level by two because Milner abused a position of trust in a manner that significantly facilitated the commission or concealment of the fraud. See U.S.S.G. § 3B1.3; Milner PSR ¶ 37. Milner receives a three-level reduction for acceptance of responsibility. See U.S.S.G. § 3E1.1(b); Milner PSR ¶ 41. Milner's total adjusted offense level is therefore 24. Because Milner has no criminal history points, her criminal history category is I. The advisory guideline range for criminal history category I and offense level 24 is 51 to 63 months. See U.S.S.G. § 5A (sentencing table); Milner PSR ¶ 45.

Milner objects to the two-level enhancement under U.S.S.G. § 3B1.1(c) for her role in the offense.[1] Milner contends that she was not an organizer or leader. Rather, she argues that she and Thompson were equal partners in the fraud.

A defendant's role in the offense is a factual question for the district court. See, e.g., United States v. Sayles, 296 F.3d 219, 224 (4th Cir. 2002). The government bears the burden of proving Milner's leadership role in the offense by a preponderance of the evidence. See, e.g., United States v. Melton, 970 F.2d 1328, 1334 (4th Cir. 1992). In determining a defendant's role in the offense, the Guidelines Manual lists seven nonexclusive factors that a court may consider: (1) whether the defendant exercised decisionmaking authority; (2) the nature of the defendant's participation; (3)

---

[1] Milner initially made two other objections to the PSR's advisory guideline calculations, which she withdrew at her sentencing hearing.

7

whether the defendant recruited others; (4) whether the defendant claimed a larger share of the proceeds; (5) the defendant's degree of participation in planning or organizing the offense; (6) the nature and scope of the crime; and (7) the defendant's degree of control over others. See U.S.S.G. § 3B1.1 cmt. n.4.[2]

Here, Milner exercised decisionmaking authority by determining which bundles of funds the women would steal. She planned each transaction, scanning BB&T's accounts to determine the target bundle, and directed Thompson how much to request in each false cash letter. Milner's participation was extensive and essential to executing the scheme to defraud. Moreover, she claimed 66% of the purloined funds. For these reasons and the reasons stated in open court, Milner was an organizer or leader, and her objection is overruled. Her advisory guideline range remains 51 to 63 months.

B.

The court turns next to Thompson's advisory guideline range, as discussed in her PSR. As with defendant Milner, the bank fraud and aiding and abetting counts are grouped. See U.S.S.G. § 3D1.2(d); Thompson PSR, Part D. The base offense level for violating 18 U.S.C. § 1344 is 7. See U.S.S.G. § 2B1.1; Thompson PSR ¶ 36. Because the loss exceeded $400,000 but was less than $1,000,000, the court adds 14 levels. See U.S.S.G. § 2B1.1(b)(1)(H); Thompson PSR ¶ 37. The court adds two levels because the offense involved "sophisticated means." See U.S.S.G. § 2B1.1(b)(9)(C); Thompson PSR ¶ 38. Thompson receives a three-level reduction for acceptance of responsibility. See U.S.S.G. § 3E1.1(b); Thompson PSR ¶ 44. Thompson's total adjusted offense

---

[2] Although the Guidelines Manual suggests that these factors be used to distinguish a leadership role from a mere managerial role, see U.S.S.G. § 3B1.1 cmt. n.4, courts have used these same factors to distinguish a managerial role from a non-managerial role. See, e.g., United States v. Wall, 214 F. App'x 318, 319 (4th Cir. 2007) (per curiam) (unpublished).

8

level is 20. Thompson has no criminal history points, and her criminal history category is therefore I. The advisory guideline range for criminal history category I and offense level 20 is 33 to 41 months. See U.S.S.G. § 5A (sentencing table); Thompson PSR ¶ 48.

Thompson objects to the two-level increase under U.S.S.G. § 2B1.1(b)(9)(C) for "sophisticated means." Alternatively, Thompson objects to not receiving a two-level reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the criminal activity.[3] The court turns first to Thompson's sophisticated means objection.

Thompson contends that she did not use sophisticated means because her role was akin to that of a bank teller embezzling funds. Whether an offense involved "sophisticated means" is a factual question which the district court resolves by a preponderance of the evidence. See, e.g., United States v. Noe, 191 F. App'x 216, 218 (4th Cir. 2006) (per curiam) (unpublished). "Sophisticated means" are those which are "especially complex or intricate" as regards "the execution or concealment of the offense." U.S.S.G. § 2B1.1 cmt. n.8(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." Id. Courts have held that the sophisticated means enhancement applies when the offense conduct is more complex than the average case. See, e.g., United States v. Finck, 407 F.3d 908, 911, 915 (8th Cir. 2005) (concluding that sophisticated means enhancement properly applied where defendant engaged in fraudulent scheme to acquire motor vehicles and ultimately pleaded guilty to "transportation of a stolen vehicle in interstate commerce — an offense that can be as simple as stealing a car and driving it across state lines"); United States v. Humber, 255 F.3d 1308, 1313–14 (11th Cir. 2001) (illustrating application

---

[3] Thompson initially made two factual objections to her PSR, which she withdrew at her sentencing hearing. Those factual objections did not impact her advisory guideline range.

9

of sophisticated means enhancement where "[defendant's] crime against the Bank involved continuous acts of fraud over a seven year" period); accord United States v. McCormick, 208 F. App'x 246, 247–48 (4th Cir. 2006) (per curiam) (unpublished) (concluding that sophisticated means enhancement properly applied in uttering case where "[t]here was far more to the offense than forging a signature, as McCormick suggests"); United States v. Stone, 85 F. App'x 925, 938 (4th Cir. 2004) (per curiam) (unpublished) ("Sophisticated means includes conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." (quotation omitted)). A simple check-kiting scheme can constitute bank fraud, see, e.g., United States v. Pardo, 25 F.3d 1187, 1189 (3d Cir. 1994), and the defendants' offense conduct went far beyond that. Milner hid the fraud under multiple layers of internal transactions. Thompson helped to execute the fraud by repeatedly sending fraudulent cash letters containing fictitious names. Thompson also helped to hide some of the stolen funds in multiple bank accounts. See Thompson PSR ¶¶ 9, 13. For these reasons and the reasons stated in open court, Thompson's sophisticated means objection is overruled.

Alternatively, Thompson objects to not receiving a two-level reduction under U.S.S.G. § 3B1.2(b) for being a "minor participant" in the criminal activity. Thompson bears the burden of proving her "minor role" by a preponderance of the evidence. See, e.g., United States v. Akinkoye, 185 F.3d 192, 202 (4th Cir. 1999). A "minor participant" is one "who is less culpable than most other participants . . . ." U.S.S.G. § 3B1.2 cmt. n.5. With respect to the "minor participant" adjustment, "[t]he critical inquiry is . . . not just whether the defendant has done fewer 'bad acts' than [her] co-defendant[], but whether the defendant's conduct is material or essential to committing the offense." United States v. Pratt, 239 F.3d 640, 646 (4th Cir. 2001) (quotation omitted).

Here, Thompson's conduct was material and essential to committing the fraud. She drafted the fictitious claim letters requesting the sums that Milner targeted, and faxed the fraudulent letters

10

to Milner. Thompson also helped mask the fraud by transferring stolen funds from her own account to other accounts. See Thompson PSR ¶¶ 9, 13. For these reasons and the reasons stated in open court, Thompson was not a minor participant, and her objection is overruled. Accordingly, Thompson's advisory guideline range remains 33 to 41 months.

The government filed a motion for downward departure under U.S.S.G. § 5K1.1 on Thompson's behalf for providing substantial assistance to the government. The government recommended a 25% reduction from the low end of the advisory guideline range. Upon motion by the government, a court may depart below the advisory guideline range where "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. The court has discretion to determine whether to grant the motion and (if granted) the amount of any reduction. Id. § 5K1.1(a). In exercising its discretion, the court may consider, inter alia, the significance and usefulness of the defendant's assistance, the veracity and reliability of information provided by the defendant, the nature and extent of the assistance, whether the defendant risked peril to provide the assistance, and the timeliness of the assistance. Id.

As stated in open court, the court has considered the totality of Thompson's cooperation and finds the government's motion extremely weak. The key substantial assistance allegedly provided by Thompson consisted of making a monitored phone call to Milner regarding the purported third person involved in the scheme. By the time Thompson placed the phone call, however, the government already knew to a reasonable certainty that there was no third person involved in the scheme. Any information or statements the government gained through the phone call were not useful in its case against Milner. Nonetheless, because the information may have been useful to the investigation in a marginal sense, the court will grant the government's motion under U.S.S.G. §

11

5K1.1. However, as stated in open court, the court in its discretion rejects the government's recommended sentence for defendant Thompson.

IV.

Under the procedure described in Gall, the court next must undertake an individualized assessment of the facts of each case in light of the factors listed in 18 U.S.C. § 3553(a). See Gall, 128 S. Ct. at 596–97. These factors include, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and protect the public from further crimes of the defendant, the need to avoid unwarranted sentencing disparities among similar defendants who committed similar crimes, and the need to provide restitution to victims of the offense. See 18 U.S.C. § 3553(a). The court must select a sentence in light of these factors and all other factors under section 3553(a), and must adequately explain the rationale for its sentence. Gall, 128 S. Ct. at 597. A variance sentence outside the advisory guideline range must be supported by a rationale sufficiently compelling to support the extent of the deviation. Id.

As stated in open court, the nature and circumstances of this offense are unique, and particularly disturbing. The length, scope, and sheer number of transactions involved in this offense are extraordinary, and reveal the defendants' relentless dedication to defrauding BB&T. Milner and Thompson spent over eight years stealing from BB&T. They stole over $600,000 from an institution where Milner held a position of trust. Milner concealed the evidence of her crimes using inside knowledge of the banking system gained through opportunities that BB&T provided to her. Moreover, Thompson helped execute the scheme with over 100 false cash letters and further concealed evidence of the scheme by hiding stolen funds in the bank accounts of others, including her minor daughter. Additionally, the sheer number of transactions involved is astonishing. Milner

12

and Thompson had the opportunity to ponder what they had done after each of their 137 separate fraudulent transactions. Yet transaction after transaction, month after month, year after year, they continued to steal from BB&T. Moreover, the two had approximately eleven months to reflect on their crimes during the time when Milner quit her job and moved to Chicago. Notwithstanding this lengthy period of time in which to reflect, each elected to continue the fraud upon Milner's return to BB&T. As mentioned, after Milner's return to BB&T, the pair stole $539,960.11, and the scheme had no planned ending point. In this court's view, the women intended to continue stealing from BB&T indefinitely, and believed that they had devised the perfect crime.

The court considers this a very unique and very serious offense in light of the length, scope, and breadth of the offense, the elaborate nature of the scheme, and the near eleven-month break in the offense conduct. The court must impose a sentence that reflects this seriousness, will promote respect for the law, and will deter others. Deterring conduct of this unique nature is particularly important, because fraud of this length, scope, and breadth undermines the trust that is essential in the banking industry. Accordingly, having considered all of the relevant factors listed in 18 U.S.C. § 3553(a), the advisory guideline range, all evidence presented at the hearings, and all arguments and submissions of counsel, the court does not believe that a sentence within the advisory guideline range would be sufficient with respect to either defendant. See 18 U.S.C. § 3553(a). For these reasons and the reasons stated in open court, the court will vary upwardly with respect to each defendant.

A.

As for Milner, the court concludes for the reasons discussed above that a sentence of 72 months is sufficient, but not greater than necessary, to fulfill the purposes listed in the sentencing statute. This sentence represents a nine-month upward variance from the top of Milner's advisory guideline range. This sentence is well below the 360-month statutory maximum authorized as to

13

each count of conviction. See 18 U.S.C. § 1344. Milner is hereby committed to the custody of the Bureau of Prisons to serve a term of imprisonment of 72 months on each count, such terms to be served concurrently. Upon release from the custody of the Bureau of Prisons, Milner shall be placed on a term of five years supervised release with respect to each count, such terms to be served concurrently.

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A. After deducting the sums recovered and the sums that were stolen outside of the dates listed in the indictment, the total amount of restitution owed is $605,843.45. Milner and Thompson shall be jointly and severally liable for this amount. The court will not impose a fine in light of the restitution due. Milner shall pay a special assessment of $100 on each count of conviction, for a total of $200, which shall be due immediately. If Milner is unable to pay the restitution and the special assessments in full immediately, she may make payments through the Inmate Financial Responsibility Program. Any balance owed at the time of release shall be paid in monthly installments of $150, which shall begin 60 days after Milner's release from prison. The Probation Office shall evaluate Milner's ability to pay at the time she is released from prison, and shall notify the court if changes to the payment schedule are needed. Restitution payments shall be submitted to BB&T at the address listed in Milner's PSR.

Within 72 hours of release from the custody of the Bureau of Prisons, Milner shall report in person to the Probation Office in the district into which she is released. While on supervised release, Milner shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. Milner shall not possess a firearm or destructive device, including ammunition. Milner shall comply with the standard conditions adopted by this court and shall comply with the following additional conditions.

Milner shall consent to a warrantless search by the Probation Office or, at the request of the Probation Office, by any other law enforcement officer of defendant's person or premises, including any vehicle, to determine compliance with the conditions of this judgment. Milner shall submit to financial or consumer credit counseling as directed by the Probation Office. Milner shall cooperate in the collection of DNA as directed by the Probation Office. The court suspends the drug testing conditions of 18 U.S.C. § 3608. Milner was advised of her appeal rights in open court.

B.

As for Thompson, the court rejects the government's recommended sentence. For the reasons discussed above, the government's recommendation fails to sufficiently account for the uniquely troubling nature, circumstances, and seriousness of the offense, as well as the need to deter the conduct at issue in this case. However, the court will credit Thompson's assistance under U.S.S.G. § 5K1.1 in fashioning "just punishment" under 18 U.S.C. § 3553(a)(2)(A). Accordingly, the court concludes that a sentence of 48 months is sufficient, but not greater than necessary, to fulfill the purposes listed in the sentencing statute. This sentence represents a seven-month upward variance from the top of Thompson's advisory guideline range. This sentence (like Milner's sentence) is well below the 360-month statutory maximum authorized as to each count of conviction. See 18 U.S.C. § 1344. Thompson is hereby committed to the custody of the Bureau of Prisons to serve a term of imprisonment of 48 months on each count, such terms to be served concurrently. Upon release from the custody of the Bureau of Prisons, Thompson shall be placed on a term of five years supervised release with respect to each count, such terms to be served concurrently.

Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A. After deducting the sums recovered and the sums that were stolen outside of the dates listed in the indictment, the total amount of restitution owed is $605,843.45. Milner and Thompson shall be jointly and severally

15

liable for this amount. The court will not impose a fine in light of the restitution due. Thompson shall pay a special assessment of $100 on each count of conviction, for a total of $200, which shall be due immediately. If Thompson is unable to pay the restitution and the special assessments in full immediately, she may make payments through the Inmate Financial Responsibility Program. Any balance owed at the time of release shall be paid in monthly installments of $100, which shall begin 60 days after Thompson's release from prison. The Probation Office shall evaluate Thompson's ability to pay at the time she is released from prison, and shall notify the court if changes to the payment schedule are needed. Restitution payments shall be submitted to BB&T at the address listed in Thompson's PSR.

Within 72 hours of release from the custody of the Bureau of Prisons, Thompson shall report in person to the Probation Office in the district into which she is released. While on supervised release, Thompson shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. Thompson shall not possess a firearm or destructive device, including ammunition. Thompson shall comply with the standard conditions adopted by this court and shall comply with the following additional conditions.

Thompson shall participate in a program of mental health counseling, as directed by the Probation Office. Thompson shall consent to a warrantless search by the Probation Office or, at the request of the Probation Office, by any other law enforcement officer of defendant's person or premises, including any vehicle, to determine compliance with the conditions of this judgment. Thompson shall submit to financial or consumer credit counseling as directed by the Probation Office. Thompson shall cooperate in the collection of DNA as directed by the Probation Office. The court suspends the drug testing conditions of 18 U.S.C. § 3608. Thompson was advised of her appeal rights in open court.

C.

The court notes that it has imposed the sentences discussed above after considering all the facts and circumstances of the case, and would still impose the same sentence even if it has incorrectly calculated the advisory guideline range. Cf., e.g., United States v. Keene, 470 F.3d 1347, 1348–50 (11th Cir. 2006). The court believes that the variance sentences it has imposed in this case are the sentences that are "sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); cf., e.g., United States v. Shortt, 485 F.3d 243, 246, 253 (4th Cir. 2007) (holding that upward variance from zero- to six-month advisory guideline range to year-and-a-day sentence was reasonable); United States v. McClung, 483 F.3d 273, 275, 277 (4th Cir. 2007) (holding that upward variance from 51- to 63-month advisory guideline range to 84-month sentence was reasonable); accord United States v. Gordon, No. 07-1714, 2008 WL 141796, at *2–*3, *8 (7th Cir. Jan. 16, 2008) (holding that upward variance from 57- to 71-month advisory guideline range to 96-month sentence was reasonable); United States v. Klups, No. 06-1931, 2008 WL 89949, at *1–*2 (6th Cir. Jan. 10, 2008) (holding that upward variance from 24- to 30-month advisory guideline range to 60-month sentence was reasonable); United States v. Braggs, No. 07-1148, 2008 WL 60180, at *1, *4 (8th Cir. Jan. 7, 2008) (holding that upward variance from 15- to 21-month advisory guideline range to 48-month sentence was reasonable).

V.

The court has imposed these sentences for the reasons discussed herein and the reasons discussed in open court, which are hereby incorporated by reference. This order memorializes the court's judgment as announced at each defendant's sentencing hearing on January 16, 2008, and is not intended to alter or amend any part of the court's judgment with respect to either defendant as announced in open court.

SO ORDERED. This 23 day of January 2008.

                                      JAMES C. DEVER III
                                      United States District Judge